**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 9:21-cv-80382-CANNON/REINHART**

In re:

Ex Parte Application Pursuant to
28 U.S.C. § 1782 for an Order to
Take Discovery of Equiti US, LLC;
Gary Dennison; James Mason and
Kimberly M. Kirkland for Use in a
Foreign Proceeding

_____

**EQUITI US, LLC'S MOTION TO DISQUALIFY THE LAW FIRM OF FAEGRE**
**DRINKER BIDDLE & REATH LLP FROM REPRESENTATION OF ALL**
**PROSPECTIVE CLAIMANTS**

Respondent Equiti US, LLC ("**Equiti US**") moves to disqualify Faegre Drinker Biddle &

Reath LLP ("**Faegre**") from representation of the Petitioners (the "**Prospective Claimants**") and

to require it to withdraw from this and any other matter in which it represents the Prospective

Claimants.

**I.      INTRODUCTION**

Faegre simultaneously represents both a participant in the Alleged Mediatrix Fraud

(defined below) – Geluk Global Fund Limited SAC (the "**Geluk Fund**") – and alleged victims of

it. Florida law and common sense therefore require disqualification of Faegre.

The ties between the Geluk Fund and its manager, Geluk Capital Management Limited

("**Geluk Capital**"), its principal, Douglas Fathers ("**Fathers**"), and the Alleged Mediatrix Fraud

run deep. Michael Young ("**Young**") was simultaneously a Vice President of the Geluk Fund

and/or Geluk Capital (together "**Geluk**") and the CEO of Mediatrix Capital Inc. ("**Mediatrix**"),

namely, the entity Faegre claims defrauded its other clients. Fathers similarly had dual roles for

both Geluk and Mediatrix. He was the president and director of the Geluk Fund and was the registered contact person for two Bahamian entities the SEC claims Mediatrix used to misappropriate investor money, The 1989 Foundation and DCC Islands Foundation, both of which shared the same address as the Geluk Fund.

Given these significant ties between Geluk and Mediatrix, the potential for conflict has already been raised multiple times with Faegre. Equiti Capital UK Limited ("**Equiti UK**") first raised the conflicts issue in its response to the letter before claim sent by Faegre on November 26, 2020, on behalf of its clients at that time (which included the Geluk Fund) (the "**LBC**"). This was well before Faegre instituted any proceedings in the US. Faegre did not respond. Equiti US also raised the conflicts issue following the issuance of the SEC Order (defined below) against Geluk Capital and Fathers. This time, Faegre responded by claiming that its representation of the Geluk Fund and the other Prospective Claimants is a "limited purpose representation," and by challenging Equiti US's standing.

Faegre's representation of the Geluk Fund and the other Prospective Claimants is certainly not a limited purpose representation. Faegre sent the LBC in which Faegre threatened to file suit against Equiti UK in the English courts. Faegre has not produced any engagement agreements or other documents that would substantiate a claimed "limited purpose representation," despite its documented representation of clients intending to file suit in the English courts.

For these reasons, and others discussed below, Faegre must be disqualified.

## II.      STATEMENT OF FACTS

### A.      The Alleged Mediatrix Fraud

On September 18, 2019, the SEC filed an emergency action and obtained a temporary restraining order and asset freeze against three individuals and three entities in connection with an alleged Ponzi scheme. (*See* 9/18/2019 Public Announcement, *SEC Halts Alleged $125 Million Offering Fraud* ("**Mediatrix Press Release**"), attached as **Ex. A**.) The SEC alleged that Mediatrix, Blue Isle Markets Inc. and its successor Blue Isle Markets Ltd. (together, "**Blue Isle**"), and Young, Michael Stewart and Bryant Sewell (together, the "**Mediatrix Principals**") (collectively, and together with all entities, the "**Mediatrix Defendants**"), misappropriated investor money, made material misrepresentations, and ran a Ponzi scheme disguised as a FOREX trading fund (the "**Alleged Mediatrix Fraud**").

According to the SEC complaint, the Mediatrix Defendants raised more than $125 million from investors in unregistered securities offerings by falsely representing to investors that their money would be pooled and invested in an algorithmic FOREX trading strategy. *See SEC v. Mediatrix Capital Inc. et al.*, Case No. 1:19-cv-02594, (D. Colo., filed Sept. 12, 2019), Complaint and Jury Demand ("**Complaint**") [ECF No. 1] at ¶ 1. The SEC further alleged that the Mediatrix Defendants defrauded investors by misrepresenting the profitability of their trading, falsifying investor account statements, making Ponzi-like payments, and misappropriating millions of investor money for the Mediatrix Defendants' personal use. *See id.* at ¶¶ 2, 4. The Complaint listed various relief defendants, including "DCC Islands Foundation" and "The 1989 Foundation," each of which are shell companies that the Mediatrix Principals formed to purchase property paid for exclusively with the proceeds of the Alleged Mediatrix Fraud. *See id.* at ¶¶ 26, 29.

010-9471-4760/1/AMERICAS

Unlike Fathers, Geluk Capital, and the Geluk Fund, Equiti UK did not have any role – even alleged – in Mediatrix and the Mediatrix Principals' alleged misappropriation of investor money or making of Ponzi-like payments.

As is relevant here, Blue Isle served as a broker for the various Mediatrix funds. In turn, Blue Isle opened prime brokerage accounts first with Equiti AM in 2016 and then with Equiti UK in 2017 (these entities were formerly known as "**Divisa AM**" and "**Divisa UK**", respectively). Equiti UK and Equiti AM provided FOREX trade execution and liquidity services to Blue Isle. Additionally, Equiti US sublicensed, through a white label agreement, the MT4 trade software to Blue Isle (which Equiti US in turn licensed to it from its manufacturer, MetaQuotes Software Corp), and provided technical support related to the MT4 sublicense.

**B.      The SEC Charges the Owner/Operator and Manager of the Geluk Fund with Fraud in Connection to the Alleged Mediatrix Fraud.**

The SEC announced on June 24, 2022 that it settled fraud charges against Geluk Capital and its principal, Fathers, for misrepresenting significant aspects of a private fund that they offered and sold to investors in 2018. (*See* 6/24/2022 Public Announcement, *SEC Charges Investment Advisor for Misrepresentations in Private Fund Offering* ("**Geluk Capital Press Release**"), attached as **Ex. B**.) The SEC found that Geluk Capital and Fathers represented to investors that the Geluk Fund—Faegre's client and one of the Prospective Claimants—had its own proprietary trading strategy and risk controls that had resulted in a multi-year track record of positive performance, including through reporting documents that showed the Geluk Fund consistently delivered positive returns dating back to 2014. (*See* 6/24/2022 SEC Order (the "**SEC Order**"), attached as **Ex. C**.) But in reality, the Geluk Fund's proprietary trading strategy, rigorous risk controls, and performance track record belonged to "the Manager" to which Geluk Capital and

Fathers sent investor money. *See id.* "The Manager" at issue is Mediatrix – the very entity the Prospective Claimants allege defrauded them. *See id.* at ¶ 6.[1]

The SEC Order describes the Geluk Fund as an entity managed by Fathers and Geluk Capital: Fathers was the president and director of the Geluk Fund, *see id.* at ¶ 3, and had "*sole discretion over making investment decisions on behalf of [Geluk Capital] and the Geluk Fund*," *id.* at ¶ 2. Geluk Capital served as an investment advisor to the Geluk Fund pursuant to an "Investment and Management Agreement" wherein Geluk Capital agreed "*to provide investment advisory, investment management and investment management evaluation and monitoring services for the [Geluk] Fund*." *Id.* at ¶ 1.

Geluk Capital and Fathers, in connection with their offer and sale of securities in the Geluk Fund, made material misrepresentations and omissions with respect to the Geluk Fund's past performance, investment strategy, and risk controls. *Id.* at ¶ 8. The Geluk Fund in fact possessed no past performance, sophisticated trading methodology, or risk management processes. *Id.* at ¶ 10.

**C.      Faegre Sends the LBC on Behalf of the Geluk Fund and Other Entities.**

On October 29, 2020, a different set of investors in the Alleged Mediatrix Fraud (the "**Dismatrix Claimants**") brought a claim against Equiti UK in the UK Commercial Court alleging "knowing receipt." *See Dismatrix & Ors v. Equiti Capital UK Limited* (CL-2020-00712). Specifically, the Dismatrix Claimants contended that Equiti UK had either actual knowledge or "blind eye" knowledge of the Alleged Mediatrix Fraud. As discussed below, the Dismatrix

---

[1] Paragraph 6 of the SEC Order reads: "In September 2019, the Commission filed an enforcement action in the U.S. District Court for the District of Colorado alleging that the Manager, its affiliates, and its three principals operated a fraudulent, Ponzi-like scheme. The Commission obtained a preliminary injunction and order freezing defendants' assets, and the matter remains pending. *See SEC v. Mediatrix Capital Inc., et al.*, 19-cv-02594-RM-SKC (D. Colo.)."

Claimants later settled their claims as part of a "drop hands settlement" with no order as to costs, after receiving the same disclosure Equiti US sent to the Prospective Claimants earlier this year.

The following month, on November 26, 2020, Faegre sent the LBC to Equiti UK on behalf of twenty-five prospective claimants (the "**Original Prospective Claimants**"). The LBC alleged that the Mediatrix Defendants: (1) fraudulently induced investment through material misrepresentations to investors; and (2) fraudulently induced those investors to maintain and/or increase their investments by falsifying their account statements and making Ponzi-like payments to investors. The LBC further alleged that: (1) Equiti UK facilitated and concealed the Alleged Mediatrix Fraud, or (2) at the least should have been aware of the Alleged Mediatrix Fraud given the operational support Equiti UK provided to Blue Isle and the numerous "red flags" that arose during the context of that relationship. By letter dated 16 February 2021, Equiti UK rejected, in their entirety, all claims alleged by Faegre in the LBC. Equiti UK's response also flagged the potential links between Mediatrix and the Geluk Fund. (*See* Equiti UK's 2/16/2021 Response to the LBC ("**LBC Response**"), ¶ 13.4, attached as **Ex. D**.)

To the best of Equiti US's knowledge, however, Faegre has not sent similar letters to Geluk Capital, the Geluk Fund or Fathers.

D.    **Faegre Initiates Several Discovery Actions Under 28 U.S.C. § 1782 on Behalf of Parties with Conflicting Claims.**

On February 22, 2021, Faegre filed the *Ex Parte* Application Pursuant to 28 U.S.C. § 1782 for an Order to Take Discovery of Equiti US and other individuals. (*See* In re *Ex Parte* Application Pursuant to 28 U.S.C. § 1782 ("**Section 1782 Application**") [ECF No. 1].) The Section 1782 Application sought an order allowing the Original Prospective Claimants to serve discovery and obtain documents and testimony for use in an anticipated foreign proceeding in the High Court of England and Wales. *See id.* But, despite issuing the LBC on November 26, 2020, and despite

- 6 -

repeatedly stating their intention to issue proceedings in England in the Original Prospective Claimants' filings in support of the Section 1782 Application, other related section 1782 applications,[2] and in oral statements in hearings before this Court, the Prospective Claimants have yet to file an action in England.

The Original Prospective Claimants were joined in the Section 1782 Application by a separate group of claimants represented by Pillsbury Winthrop Shaw Pittman LLP, known as the Dismatrix Claimants. As noted above, unlike the Prospective Claimants, the Dismatrix Claimants actually filed suit in England. But after receiving tens of thousands of documents and taking at least 9 depositions in the United States, the Dismatrix Claimants settled their claims against Equiti UK as part of a "drop hands" settlement with no order as to costs.

As with the LBC, Faegre's representation in the Section 1782 Application includes the Geluk Fund, which was led by Geluk Capital and Fathers when it was initiated, and several Prospective Claimants against whom the SEC has not taken adverse action. *See* SEC Order. Faegre continues to represent the Geluk Fund even after the SEC Order became public.

## III.   LEGAL STANDARDS

Disqualification motions are governed by Florida law and federal common law. *Herrmann v. GutterGuard, Inc.*, 199 F. App'x 745, 752 (11th Cir. 2006). When material facts are in dispute, evidentiary hearings are typically—but not always—necessary to evaluate disqualification of counsel. *RJSG Properties v. Marbella Condominium Developers, LLC*, Case No. 3:08cv302, 2009 U.S. Dist. LEXIS 105605, at *10-11 (N.D. Fla. Oct. 28, 2009); *Sch. Bd. of Broward County v. Polera Bldg. Corp.*, 722 So.2d 971, 973-74 (Fla. 4th DCA 1999); *Holland v. Tenenbaum*, 360

---

[2] *See*, *e.g.*, 3/17/2022 *Ex Parte* Application Pursuant to 28 U.S.C. § 1782 for an Order to Take Discovery of Jichen Wu for Use in a Foreign Proceeding, 2:22-cv-01517-JMV-JSA (D. N.J.).

So.2d 493, 493 (Fla. 4th DCA 1978); *Event Firm, LLC v. Augustin*, 985 So. 2d 1174 (Fla. Dist. Ct. App. 2008).

Federal courts have the power to regulate the conduct of attorneys who practice before them. *In re Snyder*, 472 U.S. 634, 645 n.6 (1985); *Lira v. Matthew's Marine Air Conditioner, Inc.*, 741 F. Supp. 2d 1305, 1313 (S.D. Fla. 2010). The standards of professional conduct of attorneys appearing in this District are governed by the Rules Regulating the Florida Bar and Florida law. *See* S. D. Fla. L.R. 11.1(c) (2021); *SEC v. Commodities Online, LLC*, Case No. 11-60702, 2012 U.S. Dist. LEXIS 201763, at *11 (S.D. Fla. Feb. 20, 2012) (citing *General Cigar Holdings, Inc. v. Altadis, S.A.*, 144 F. Supp. 2d 1334, 1338 (S.D. Fla. 2001)). The Florida Rules of Professional Conduct set forth the standard determining whether counsel should be disqualified. *Alters v. Villoldo*, 230 So.3d 115 (Fla. Dist. Ct. App. 2017) (citing *Young v. Achenbauch*, 136 So.3d 575, 580 (Fla. 2014)).

Under Florida law, "*[a]n order involving the disqualification of counsel must be tested against the standards imposed by the Rules of Professional Conduct.*" *Lifecell IP Holdings, LLC v. Cosmedique, LLC*, Case No. 0:19-cv-60978, 2020 U.S. Dist. LEXIS 254842, at *7 (S.D. Fla. Sept. 1, 2020) (quoting *Morse v. Clark*, 890 So. 2d 496, 497 (Fla. 5th DCA 2004) (citing *City of Lauderdale Lakes v. Enter. Leasing Co.*, 654 So. 2d 645 (Fla. 4th DCA 1995)); *Cazares v. Church of Scientology of Cal., Inc.*, 429 So. 2d 348 (Fla. 5th DCA 1983)). Concurrent representation is regulated by Rule 4-1.7 of the Rules Regulating the Florida Bar, which provides:

> (a) **Representing Adverse Interests**. Except as provided in subdivision (b), a lawyer shall not represent a client if:
>
> > (1) the representation of 1 client will be directly adverse to another client; or

(2) there is a substantial risk that the representation of 1 or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) **Informed Consent**. Notwithstanding the existence of a conflict of interest under subdivision (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a position adverse to another client when the lawyer represents both clients in the same proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing or clearly stated on the record at a hearing.

Fla. R. Regulating the Bar, 4-1.7 (2022).

This rule "*prohibits concurrent adverse representation unless the attorney obtains consent from each client and can demonstrate that their representation will not be impaired.*" *General Cigar Holdings, Inc. v. Altadis, S.A.*, 144 F. Supp. 2d 1334, 1338 (S.D. Fla. 2001). "The two basic purposes behind Rule 4-1.7(a) are to protect confidences that a client may have shared with his attorney, and to safeguard loyalty as a feature of the attorney-client relationship." *Prudential Ins. Co. of Am. V. Anodyne, Inc.*, 365 F. Supp. 2d 1232, 1237 (S.D. Fla. 2005) (citation omitted).

"*The party moving to disqualify counsel bears the burden of proving the grounds for disqualification.*" *Lifecell IP Holdings*, 2020 U.S. Dist. LEXIS 254842, at *7 (quoting *Armor Screen Corp. v. Storm Catcher, Inc.*, 709 F. Supp. 2d 1309, 1310 (S.D. Fla. 2010) (*citing In re BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003)); *see also Suchite v. Kleppin*, 784 F. Supp. 2d 1343, 1346 (S.D. Fla. 2011). When the representation of two clients with adverse interests is concurrent, the representation is *prima facie* improper. *General Cigar*, 144 F. Supp. 2d at 1337.

An attorney concurrently representing multiple clients bears the "*heavy burden of demonstrating that there will be no actual or apparent conflict in loyalties or a diminution in the vigor of their representation*." *Id.* at 1338 (citation omitted). In addition, an attorney concurrently representing multiple clients bears the burden of proving full disclosure of the adverse effects of the representation and informed consent. *Id.*

## IV.   ARGUMENT

Faegre is subject to disqualification because it is simultaneously representing clients with conflicting interests, which implicates its duty of confidentiality.

### A.   Faegre's Representation of the Geluk Fund Is Directly Adverse to its Representation of the Other Prospective Claimants Because Other Prospective Claimants Have Claims Against the Geluk Fund.

A lawyer's duty to his client is that of a fiduciary or trustee. *Harte Biltmore, Ltd. v. First Penn. Bank, N.A.*, 655 F. Supp. 419, 421 (S.D. Fla. 1987) (citation omitted). A client who retains an attorney to represent him expects the attorney's "*undivided loyalty*" as his "*advocate and champion*." *Id.* (citation omitted). A lawyer represents adverse interests when it becomes the lawyer's duty, on behalf of one client, to advocate for a result that "*his duty to another client would require him to oppose.*" *See The Florida Bar v. Moore*, 194 So. 2d 264, 269 (Fla. 1966).

Disqualification is required here because Faegre's multiple representation involves representing multiple, adverse interests. *Harte Biltmore*, 655 F. Supp. at 421 (citation omitted); *see also Harvey E. Morse, P.A. v. Clark*, 890 So.2d 496, 498 (Fla. 5th DCA 2004) ("*The existing client rule is based on the ethical-concept requirement that a lawyer should act with undivided loyalty for his client and not place himself or herself in a position where a conflicting interest may affect the obligations of an ongoing professional relationship*"). Further, disqualification of any one lawyer under Rule 4-1.7 is imputed to all lawyers in the firm. R. Reg. Fla. Bar 4–1.10(a).

Faegre's representation of the Geluk Fund and other Prospective Claimants presents an actual or apparent conflict in loyalties, a diminution in the vigor of representation, and an impossibility to even consider avenues of recourse that may be in the best interest of the Prospective Claimants, given the Geluk Fund's, Geluk Capital's and/or Fathers' participation in the fraud. *General Cigar*, 144 F. Supp. 2d at 1338.

i. **The Geluk Fund's Role in the Alleged Mediatrix Fraud**

The SEC's findings in the SEC Order prove that the Geluk Fund, Geluk Capital and Fathers, were in no way "victims" of the Alleged Mediatrix Fraud. Until the Geluk Fund surrendered its Bahamian securities license in 2019, it was managed by Geluk Capital and Fathers. SEC Order at ¶¶ 1-3. And the Geluk Fund raised $450,000 from US-based investors alone, through fraudulent misrepresentations regarding past performance and investment oversight. SEC Order at ¶ 4. The Geluk Fund then transferred these proceeds to Mediatrix, after Fathers and Geluk Capital deducted fraudulently calculated "performance fees." *See* SEC Order.

The role of Geluk Capital, the Geluk Fund and Fathers in the Alleged Mediatrix Fraud is not even limited to fraudulently raising money for it. A January 2017 press release on the Geluk Fund's website listed Young, the CEO of Mediatrix and a Mediatrix Principal being actively pursued by the SEC in connection with the Complaint and criminally prosecuted by the DOJ, as vice-chairman of "Geluk." (*See* 1/24/2017 Press Release, *Geluk Global Gold Fund Awarded the 2017 AI Hedge Fund Award for "Best New Global Gold Fund"* ("**Geluk Global Funds Press Release**"), attached as **Ex. E**.) "Geluk" is defined in that same press release to mean "Geluk Global Fund Ltd SAC" – the very Prospective Claimant that Faegre represents. *See id.* A screenshot of Young's LinkedIn page from August 2017 similarly lists Young as vice-chairman of Geluk Capital. (*See* 3/8/2017 Screenshot of Michael S. Young LinkedIn Profile, attached as **Ex. F**.) And

- 11 -

two vehicles the Mediatrix Principals used to purchase real estate with that misappropriated money—The 1989 Foundation and DCC Islands Foundation—listed their correspondence addresses as "c/o Douglas Fathers" at the Geluk Fund's Bahamas address. (*See* 9/18/2019 Summons in a Civil Action to The 1989 Foundation, attached as **Ex. G**; *see also* 9/18/2019 Summons in a Civil Action to the DCC Islands Foundation, attached as **Ex. H**.) The Geluk Fund and Mediatrix even shared the same Bahamian corporate registration firm (Sterling Bahamas Limited) and were struck off the Bahamian corporate register on the same day, January 14, 2021. (*See* Geluk Capital Management Ltd.'s Company Register Detail, attached as **Ex. I**; *see also* Mediatrix Capital Inc.'s Company Register Detail, attached as **Ex. J**.)

The Geluk Fund, Fathers, and Geluk Capital therefore were intertwined with Mediatrix every step of the way – not least because of Young's role as vice-chairman. The Geluk Fund and the other Prospective Claimants' interests therefore appear, based on publicly available information alone, to be at odds with one another. *See Campellone v. Cragan*, 910 So. 2d 363 (Fla. Dist. Ct. App. 2005).

### ii.   Prospective Claimants' Claims Against the Geluk Fund

The few facts we know already show that Faegre should be directing the Prospective Claimants to either pursue, or at the very least actively consider whether to pursue, an action against its current client, the Geluk Fund, and its principals Geluk Capital and Fathers, rather than Equiti UK. At most, Equiti UK was a trade execution and liquidity provider of the type routinely found not liable for a fraud committed by an underlying brokerage client. *See, e.g.*, *In re January 2021 Short Squeeze Trading Litig.*, Case No. 21-02989, 2022 U.S. Dist. LEXIS 14638, at *75-78 (S.D. Fla. Jan. 27, 2022); *see also Lawrence*, 455 Fed App'x 904, 907 (11th Cir. 2012) (finding allegation that bank should have known of Ponzi scheme insufficient as a matter of law to state a

claim for aiding and abetting breach of fiduciary duty); *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1244-45 (M.D. Fla. 2013).

The Geluk Fund, Geluk Capital and Fathers, on the other hand, appear to have supported Mediatrix's misappropriation of investor money and illegal use of such funds to invest in Bahamian real estate and/or, in the case of the Geluk Fund and/or Geluk Capital, to have even shared an executive officer, Young, with Mediatrix from January 2017 – during the period in which the SEC alleges that the Alleged Mediatrix Fraud took place. Accordingly, any legitimate victim of the Alleged Mediatrix Fraud could have a valid claim against them, even if the victim had no direct interactions with the Geluk Fund, Geluk Capital, or Fathers. Thus, absent the obvious conflict of interest, there is no logical reason for the other Prospective Claimants to pursue Equiti UK rather than the Geluk Fund, Geluk Capital and/or Fathers.

**B.      Faegre's Conflict of Interest Requires Disqualification.**

Faegre's current representations require it to assert for one or more Prospective Claimants positions that are adverse to those of another Prospective Claimant, the Geluk Fund, and to do so in the same future proceeding before the same future tribunal. *See Anheuser-Busch Cos. v. Staples*, 125 So. 3d 309, 313-314 (Fla. 1st DCA 2013). "*Because fewer than all the requirements of [Rule 4-1.7(b)] are met, client consent to continued dual representation by the law firm is insufficient to permit the firm to continue its representations in the face of a conflict. The conflict is thus not one capable of being waived by client consent*." *Id.* at 314.

*Anheuser-Busch* is instructive. The First District Court of Appeal determined that the trial court did not err in determining that a conflict of interest existed and in disqualifying the law firm representing both petitioners, the alleged tortfeasors, in a negligence suit brought by the respondent and the respondent's employer. 125 So. 3d at 310. Specifically, the trial court determined that it

- 13 -

was unreasonable for the law firm to believe that it could provide competent and diligent representation to both petitioners and respondent's employer in a mediation. Petitioners' interest would lie in minimizing the damages awarded by a verdict or settlement while the employer's interest would lie in helping the respondent recover the maximum possible damages against petitioners so that it could maximize its recovery on its workers' compensation lien. *Id.* at 312, n.2.

Here, despite its baseless recent statements to the contrary, Faegre represents the Prospective Claimants in their anticipated litigation alleging financial loss as a result of the Alleged Mediatrix Fraud and Equiti UK's purported involvement therein. Included among the Prospective Claimants, however, is the Geluk Fund, which participated in both Mediatrix's fundraising and misappropriation of assets. Faegre therefore cannot simultaneously represent both the Prospective Claimants and the Geluk Fund without running afoul of its duty of loyalty to at least one client or the other.

Further, the prejudice to the Prospective Claimants of disqualifying Faegre is minimal to nonexistent. Faegre can always share the discovery it has received from Equiti US and the other nonparties in this proceeding with new counsel who are not operating under a conflict of interest. And Faegre cannot reasonably expect to vigorously represent the Prospective Claimants that, on the one hand, allege loss as a result of the Alleged Mediatrix Fraud and, on the other hand, represent the Geluk Fund as a Prospective Claimant, an entity that appears to have at least participated to some extent in that same fraud and to have Young as an executive. Indeed, both the Geluk Fund and the other Prospective Claimants would be better served by counsel able to exercise independent, conflict-free decision-making and analysis.

- 14 -

**C.**      **Faegre Must Also Be Disqualified Because Its Duty of Confidentiality to Prospective Claimants Is Compromised.**

Faegre's conflict in this case is compounded by the fact that it has obtained material client confidential information from Prospective Claimants, including the Geluk Fund, that is relevant in this and any future proceeding, including proceedings that some Prospective Claimants could institute against the Geluk Fund, Geluk Capital, and Fathers. This circumstance weighs in favor of disqualification, as Faegre's continued involvement will result in continued accumulation of sensitive material that Faegre would have a duty to share among parties with competing interests.

Florida Rule 4-1.6(a) states that a lawyer must not reveal information protected from disclosure unless the client gives informed consent, or the disclosure is permitted by one of the limited exceptions under the rule. *See* R. Reg. Fla. Bar, 4-1.6(a). This prohibition is reinforced by Florida Rule 4-1.8(b), which specifically addresses use of a current client's information, and generally provides that a lawyer "*is prohibited from using information relating to representation of a client to the disadvantage of the client unless the client gives informed consent*…." R. Reg. Fla. Bar, R. 4-1.8(b).

Here, Faegre is bound by the duty of confidentiality to refrain from disclosing information about the remaining Prospective Claimants to the Geluk Fund, and vice versa, but it is also bound by a duty of loyalty to each, which includes a duty to share pertinent information. This presents an insurmountable Hobson's choice. On the one hand, Faegre—in acquiring confidential information during its representation of the Geluk Fund—might feel the obligation to tell the remaining Prospective Claimants only such information that is readily discoverable, while holding the Geluk Fund's confidential details private. However, if this confidential information involves or affects the remaining Prospective Claimants' claims against the Geluk Fund, Faegre would find itself in the position of either violating its duty of confidentiality to the Geluk Fund or violating its duty of

- 15 -

loyalty to the Prospective Claimants. This is an indisputable conflict of interest that Faegre cannot cure. *See*, *e.g.*, *Harvey E. Morse*, 890 So. 2d at 498.

D.       **Equiti US Has Standing to Raise the Conflict Issue.**

"*Where the conflict [between a lawyer and that lawyer's clients] is such as clearly to call in question the fair or efficient administration of justice, opposing counsel may properly raise the question.*" *Shaw v. Broad & Cassel*, Case No. 11-23689, 2012 U.S. Dist. LEXIS 12054, at *7-8 (S.D. Fla. Feb. 1, 2012) (quoting Fla. Bar R. Prof'l Conduct 4-1.7 cmt.). Equiti US therefore has standing because the conflict "*is clear and [raises] the question of [the] fair and efficient administration of justice.*" *Id.* at *8 (quoting *Kenn Air Corp. v. Gainesville-Alachua Cty. Reg'l Airport Auth.*, 593 So. 2d 1219, 1222 (Fla. 1st DCA 1992) (granting standing to a party to move to disqualify the opposing party's counsel because of "*two ethical violations that can be clearly seen by persons other than clients*")); *see also Boca Raton Reg'l Hosp., Inc. v. Williams*, Case No. 4D17-1732, 2017 Fla. App. LEXIS 17577 (Fla. 4th DCA Nov. 22, 2017) (finding trial court had erred in deciding that petitioners lacked standing to seek to disqualify counsel because the conflict was one that clearly called into question the fair or efficient administration of justice).

The fair and efficient administration of justice is compromised in this instance. Faegre's continued representation of the Geluk Fund after the publication of the SEC Order, in which the Geluk Fund is directly implicated in the Alleged Mediatrix Fraud, casts a clear "*appearance of impropriet*y" such that it would impact the "*public's perception of the integrity of the bar*." *Kenn Air*, 593 So. 2d at 1223. Faegre's simultaneous representation in this proceeding of the Geluk Fund and the Prospective Claimants is an ethical violation that can be seen clearly by any objective standard. *See id.* at 1222.

- 16 -

### E.      Faegre's Reasons as to Why No Conflict Exists Are Unavailing.

In response to a meet and confer letter, email, and phone call, Faegre offered two principal reasons as to why it does not need to withdraw, in addition to lack of standing: (1) that Faegre's representation is a "limited purpose" representation; and (2) that the claims against the Geluk Fund, Geluk Capital, and Fathers are "speculative." (*See* 10/11/2022 Letter from Faegre to Equiti US regarding the Non-Waivable Conflict of Interest ("**Faegre Meet and Confer Letter**"), attached as **Ex. K**.) Neither contention holds merit.

Faegre's representation of the Prospective Claimants is in no way limited to the Section 1782 Application and/or any related discovery efforts in the US. First, this statement flies in the face of the very nature of applications for discovery under U.S.C. § 1782, which are inherently only pursued *in furtherance* of foreign proceedings, such as the anticipated proceedings against Equiti UK in the High Court of England & Wales. Second, this is not a case in which the Prospective Claimants have engaged a separate firm of solicitors in England to represent them in the foreign substantive claim from their US attorneys representing them in the Section 1782 Application in this jurisdiction. To the contrary, Faegre submitted the LBC to Equiti UK on behalf of the Prospective Claimants and engaged in further correspondence with Equiti UK even prior to filing the Section 1782 Application. Indeed, the same partner whose name appeared on the LBC, Mr. Robert K. Campbell, also sent various letters in respect of the LBC and the LBC Response *as well as* the Section 1782 Application, indicating that in practice the same individuals at Faegre have been involved in *both* the substantive dispute and the parallel discovery efforts in the US. (*See*, *e.g.*, 2/12/2021 Letter from Faegre to Equiti UK, attached as **Ex. L**; 4/27/2021 Letter from Faegre to Equiti UK, attached as **Ex. M**; and 5/12/2021 Letter from Faegre to Equiti UK, attached as **Ex. N**.)

Third, Faegre has represented to both Equiti US and this Court, on multiple occasions, that *Faegre* intends to file a lawsuit in the High Court of England & Wales on behalf of the Prospective Claimants. Specifically, during the discovery hearing held before this Court on December 16, 2021, Mr. David Porteous made the following statements clearly evidencing that *Faegre* intends to represent the Prospective Claimants in the anticipated litigation in England and Wales: (1) "*And **we** have not filed yet*" (*see* Section 1782 Application [ECF No. 47] at 6:18-19); (2) "*And particularly the sooner **we** file proceedings, then **we** will somewhere down the road be able to get disclosure*" (*id.* at 52:18-19); (3) "*__We__ have anticipated proceedings. **We've** been conducting this discovery to figure out what claims **we** want to bring*" (*id.* at 69:8-10); and (4) "*I mean, the purpose of this discovery is to get to the U.K. proceedings. And on the path to that, by way of example, your Honor, **we** had a deposition scheduled next week*" (*id.* at 72:6-8). Faegre's "limited purpose" argument is therefore belied by the facts and Faegre's own statements, conduct and admissions.

Further, even if Faegre's representation was so limited – which it isn't – that is no answer to the Respondent's motion: the potential for conflict arises not only in relation to the threatened claims against Equiti UK, but also in relation to any discovery Faegre has obtained or intends to obtain on the Prospective Claimants' behalf in furtherance of those very claims. As noted above, based on current publicly available information, Faegre could or should be seeking discovery in relation to the Geluk Fund's connections with the Alleged Mediatrix Fraud. However, owing to Faegre's dual representation of the Geluk Fund and the Prospective Claimants, it has not done so, appears to have no intention to do so, and in fact would be barred from doing so. This limitation on Faegre's ability to represent the Prospective Claimants goes to the heart of the incurable conflict presented in this motion.

- 18 -

Addressing Faegre's second point, potential claims against the Geluk Fund, Geluk Capital and/or Fathers are anything but "speculative." The SEC Order and Bahamian company registration documents, as well as Young's executive position (discussed above), show a deep involvement of Fathers and his controlled vehicles, Geluk Capital and/or the Geluk Fund, with Mediatrix. Despite Equiti UK first raising the apparent link between the Geluk Fund and Young as early as February 2021, Faegre has provided no answer to date. Geluk Capital, the Geluk Fund and Fathers may very well have defenses to those potential claims, but the same law firm representing victims of the fraud should not simultaneously be representing one of the perpetrators of it – even if the perpetrator may have some defenses to liability.

Further, while Faegre argues that it has only ever represented the Geluk Fund and not Geluk Capital or Fathers, it does not explain how the separation between all three of these parties can be maintained when it is clear from the SEC Order that Fathers was the president of, and appeared to exercise control over, both entities. Noticeably absent from Faegre's letter is any denial that Faegre has ever had any interaction with Fathers in connection with the Geluk Fund's alleged claims against Equiti UK—yet it is difficult to see who else could have engaged Faegre on the Geluk Fund's behalf in circumstances where Fathers appears to have been the ultimate controller of the Geluk Fund until the SEC Order. Respondent respectfully requests that, before the Court rules on this motion, the Court compel Faegre to, at a minimum: (1) provide copies of its engagement terms with the Geluk Fund and the Prospective Claimants; (2) confirm if it has ever had any discussions or received instructions from Fathers in connection with the Geluk Fund's claims; (3) confirm if it has represented Geluk Capital, the Geluk Fund or Fathers in any investigation by or conversation with the SEC in relation to the SEC Order, or any other regulatory authority in relation to wrongdoing by Geluk Capital, the Geluk Fund or Fathers; and (4) provide details on who now

- 19 -

instructs it on behalf of the Geluk Fund following Fathers' removal. Such engagement terms would also provide clarity on the fee arrangement agreed between Faegre, the Geluk Fund and the Prospective Claimants. If, for instance, Faegre represents the Geluk Fund and the Prospective Claimants on a contingency basis, this could cast even further doubts as to Faegre's alleged limited representation of the Prospective Claimants, as no attorney would undertake a representation limited to seeking discovery on a contingency fee.

## V.    CONCLUSION

For the reasons set forth above, Faegre must be disqualified from representing the Geluk Fund and Prospective Claimants in this proceeding or in any future litigation.

## <u>CERTIFICATE OF CONFERENCE</u>

Pursuant to Local Rule 7.1(a)(3), the undersigned counsel certify that they conferred with counsel for Petitioners on multiple occasions, through emails, letters, telephone calls, and video conferences, in a good faith effort to resolve the issues raised in this motion, but have been unable to do so.

Respectfully submitted this 2nd day of November 2022.

/s/ Sara J. Triplett
Sara J. Triplett
Florida Bar No. 99202
SQUIRE PATTON BOGGS (US) LLP
555 S. Flower Street, Suite 3100
Los Angeles, CA 90071
Telephone:  (213) 624-2500
Facsimile:  (213) 623.4581
Sara.Triplett@squirepb.com

Daniel L. Delnero
(admitted pro hac vice)
SQUIRE PATTON BOGGS (US) LLP
1230 Peachtree Street NE, Suite 3150
Atlanta, Georgia 30309
Telephone:  (678) 272-3230
Facsimile:  (678) 272-3211
Daniel.Delnero@squirepb.com

Counsel for Equiti US, LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 2, 2022, I electronically filed a copy of the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a copy of the Notice of Electronic Filing to all attorneys of record.

/s/ Sara J. Triplett
Sara J. Triplett

- 21 -